Memorandum of Decision
On May 27, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Stephen S. and Deyna E. to their minor son, Paolo S. A trial of this petition took place on July 20, 1998 before Judge Clarance J. Jones. On October 23, 1998, Judge Jones declared a mistrial and granted the motion of the foster parents, Sergio and Randi R., to intervene for dispositional purposes only. A second trial took place on February 22 and 23, 1999. For the reasons stated below, the court now grants the termination petition.
FACTS
The court finds the following facts and credits the following evidence.
 A. The Parents
The father, Stephen S., was thirty years old at the time of trial. He was born in Oklahoma City, Oklahoma and lived in Italy CT Page 2738 for eight years as a youth. The family then relocated to Dallas, Texas. Stephen began to use alcohol at age twelve, marijuana at age thirteen, and cocaine at age sixteen. Stephen nonetheless completed high school and attended college for two years. In 1992, he married and had a daughter, Brittany. Stephen obtained drug treatment in 1994 in Dallas and Atlanta, but remained abstinent for only nine months thereafter. Stephen and his wife eventually dissolved their marriage and Brittany now lives with her mother in Arkansas. Stephen came to Connecticut in 1996 to pursue a job opportunity.
Stephen has received monthly payments of $3000 from a trust fund set up by his grandmother. From this fund he has maintained child support for Brittany. Now that he has turned thirty, Stephen has inherited the principal from the fund. He has very little work history and is currently not working.
In 1995, Stephen began a nonmarital relationship with Deyna E. Deyna was born in Minnesota in 1969. As a child, she was exposed to abuse, drugs, and mental illness. Deyna graduated high school in Colorado. She was talented in music, but unfortunately began using drugs. She became itinerant, abused, and suicidal. She also gave birth to two children over whom she no longer has custody.
Paolo was born to Stephen and Deyna on January 4, 1997. Deyna had used cocaine during her pregnancy, had not obtained prenatal care, and did not have basic equipment, such as a crib, ready for the baby. Based on this history, DCF obtained temporary custody of Paolo on January 7, 1997, and placed him in the foster care of Sergio and Randi R. Paolo remains there to this day.
The parents visited Paolo once a week for Paolos first two weeks, in accordance with the initial schedule. On January 17, 1997, the court authorized visitation twice a week, two hours at a time, in an effort to facilitate reunification. The mother then missed two out of the next four visits; the father, three out of the four. The parents did bring some clothes and other gifts for the baby to the visits that they attended. From February to July, 1997, the parents attended approximately fourteen of forty-three possible visits. On May 30, 1997, the court adjudicated Paolo neglected, based on the nolo contendere pleas of both parents, and committed him to DCF for one year. In August, 1997, the parents did not show up for any of the seven available visits. In September, the parents missed the first six visits and then CT Page 2739 attended on September 29, 1997.[2] This visit was the last time that the mother saw Paolo. For the father, the visit would be the last time he saw Paolo until January 19, 1999.
Both parents attended drug evaluations in early 1997. Both tested positive for cocaine and the evaluations recommended further treatment. The mother entered an inpatient program in April, 1997, and completed the initial portion of it, but then left in May, 1997 against her counselors advice.[3] The father missed a May 2, 1997 appointment for admission to an outpatient drug program. The father called back several weeks later and a second appointment was set for June 11, 1997. The father failed to keep that appointment as well.
When the parents stopped visiting Paolo in September, 1997, DCF sent the parents a series of letters containing schedules of upcoming visits. On November 4, 1997, a DCF social worker made an unannounced visit to the parents home, in part because Deyna was close to her due date with another baby. The social worker found beer bottles all over the kitchen table and a strong smell of urine. The telephone and electricity had been recently shut off and there were no clothes, diapers, car seat, or crib for the new baby. When the social worker asked Deyna where their money had gone, Deyna denied using drugs but had no other explanation for the state of affairs. Neither parent requested a visit with Paolo or inquired about his development.
Deyna and Stephen went to Colorado for the birth, in part because Deyna had family there and in part because Deyna was concerned that DCF would take the baby. On November 17, 1997, a baby girl, Kendall, was born. Deyna and Stephen then returned to Connecticut. They resumed a life of drug use because a dealer lived next door. They did not visit Paolo, they did not recognize his first Christmas or birthday, and they did not contact DCF to inquire about his well-being. Stephen did not pay any child support for Paolo, claiming that he did not understand the procedure when a child is in foster care.
On February 13, 1998, the social worker paid a second visit to the parents home because of information she received that the parents were abusing drugs in Kendall's presence. The parents were angry about the visit and refused to sign any medical releases or speak to the worker without their lawyers. Fortunately, Kendall appeared to be on target developmentally. CT Page 2740
Stephen's mother, who lived in Texas, had always been concerned about Stephen's drug use. On February 16, 1998, the paternal grandmother and two private investigators arrived at the parents residence. They told Stephen and Deyna that they should turn their life around by leaving Connecticut and entering drug treatment. Both Stephen and Deyna made the choice to get help. Stephen flew back to Texas to enter a detoxification program and Deyna and Kendall flew back to Colorado.
After completing the detoxification program, Stephen entered the Hazelden Institute in Minnesota, which is recognized as one of the leading drug treatment centers in the country. Stephen completed a four month inpatient program. In July 1998, he transferred to a Hazelden halfway house, from which he worked and received continued therapy. In November, he returned to Texas, where he remains and continues to participate in aftercare and AA meetings. Stephen has not used drugs or alcohol since February 15, 1998.
The treatment team at Hazelden recommended that Stephen not phone or, when on leave, not visit anyone in Connecticut connected to Paolos case. Stephen followed that advice. There was apparently no prohibition on writing DCF to inquire about the case, but Stephen failed to do so. DCF, for its part, knew of Stephen's whereabouts from the paternal grandmother, and did send him certain correspondence during this time period, but failed to request that Stephen sign a release that would have authorized disclosure of information about his rehabilitation.[4] When the first termination trial arose in July, Stephen chose to stay in Minnesota rather than risk dismissal from the halfway house that he had recently entered.
Stephen did attempt to contact DCF in mid-October, 1998, as he was finishing his treatment. On November 9, 1998, when Stephen spoke to the social worker about resuming visits with Paolo, the social worker told Stephen that DCF was filing a motion to suspend the existing visitation order, which the court had reduced to one hour per week in January, 1998. Stephen got the impression, however, that an existing court order prohibited visitation and thus did not pursue the matter immediately. Stephen did inquire about Paolos health, ask to receive pictures of him, and request permission to send him a gift, which he did send.
On or about January 5, 1999, this court denied DCF's motion CT Page 2741 to suspend visitation. Following that ruling, Stephen has flown from Texas each week to visit Paolo for one hour. Those visits have gone well, as Stephen has brought books and toys that he and Paolo have enjoyed together. Paolo, however, does not recognize Stephen as his father. Stephen testified at trial that he loves Paolo, can provide for his needs generously, and wants to raise him because he is flesh and blood.
Since moving to Colorado, Deyna has contacted DCF about ten times concerning Paolo. Recently she sent Christmas and birthday presents and a disposable camera for the social worker to photograph Paolo. In February, 1998, Deyna told DCF that she did not intend to return to Connecticut for at least a year as she was getting mental health services in Colorado. She has not supplied any proof of completion of a substance abuse program or provided any releases. Deyna did not attend either the first or the second termination trials.
 B. Paolo and the Foster Parents
All parties and the court agree that Sergio and Randi R., the foster parents, have rendered excellent foster care to Paolo. Indeed, Stephen took the unusual and unselfish step of thanking the foster parents from the witness stand. He stated that they have done a "great job caring for Paolo," and that the foster parents are "the best that he could have hoped for."
Sergio and Randi had recently become licensed as foster parents when they received Paolo as their first foster child. Paolo did not prove to be an easy introduction. He was colicky and did not sleep well. The foster parents nonetheless delighted in having Paolo for what they thought would be a short stay.
Indeed, Sergio and Randi did not originally seek to become foster parents as a means of adopting children, but rather for the laudable purpose of helping biological parents address social conditions, particularly substance abuse, that were harmful to children. Randi thus wrote the natural parents a series of four letters describing Paolos first weeks, enclosed some pictures, and signed some of the letters "The Temps." The foster parents introduced Paolo to the Italian heritage of his father by giving him a set of rosaries blessed by the Pope and by other child-appropriate activities. The foster parents resisted the thought that Paolo might become their son for fear that the possible obligation to return him to the natural parents would CT Page 2742 break their heart.
The foster parents nonetheless gave Paolo the love and affection of a natural son. They made the sacrifices from their work and domestic life that good parents must make. They made Paolo part of a family, a family that currently includes three other foster children. Disappointed and frustrated by the natural parents lack of commitment to Paolo, and driven by their own growing attachment to him, the foster parents decided to seek Paolos adoption if he became legally available.
Paolo has thrived in the foster parents home. He is a bright, outgoing, and, as the testimony established, highly organized two year old boy. He is in good health. He is completely attached to Randi and Sergio, whom he calls Mom and Dad or similar names. He does not mention his natural parents.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. Such a finding was made by Judge Jones on May 1, 1998 in extending Paolos commitment to DCF to May 30, 1999.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112(d). In this adjudicatory phase, the court is CT Page 2743 limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus May 27, 1998.[5]
DCF in this case has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship with regard to both parents. The court finds that DCF has proven its allegations by clear and convincing evidence except for the allegation of failure to rehabilitate against the father.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing. reasonable degree of concern." Id. at 210.
The parents began to abandon Paolo in January, 1997, the very first month of his life, by failing to visit regularly. The parents then visited sporadically through July, not at all in August, and once in September. Neither parent visited again during the adjudicatory period. Neither parent provided gifts for Paolo except at the very outset of the adjudicatory period, neither parent recognized his first Christmas or birthday, and, after September, 1997, neither parent even inquired of DCF about Paolos welfare. The parents failed to pay child support for Paolo despite having the means to do so. While they may not have known how the process works when the child is in foster care, they did not ask DCF to assist them.[6]
It is true that, in February, 1998, the father left Connecticut to enter a drug rehabilitation program that did not allow for visits or even contact with Paolo. While the fathers CT Page 2744 successful completion of the program deserves commendation, he must accept the logical consequences of his own actions. The father could have stayed in Connecticut, obtained treatment through DCF referrals, and maintained visits with his son, as the mother did, albeit incompletely, in the spring of 1997. If the only effective way for Stephen to overcome his addiction was to remove himself from the Connecticut drug scene and enter Hazelden in Minnesota, then this result is solely attributable to the lifestyle that Stephen maintained through his own choices here in Connecticut. The father clearly had to make a difficult decision in February, 1998, but that fact does not negate the reality that he abandoned his one year old son by going to Minnesota. The court finds that DCF has proven abandonment for more than one year during the adjudicatory period by clear and convincing evidence against both parents.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). No dispute exists that the court adjudicated Paolo neglected on May 30, 1997, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). The statute requires the court to analyze the parents rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time." Inre Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In reJessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court CT Page 2745 can consider not only the parents conduct before the filing of the termination petition, but also the conduct occurring after it.
Deyna has not rehabilitated herself. She completed only the first step in her drug rehabilitation and then went back to using drugs. She may be getting mental health treatment m Colorado, but she has not provided releases that would allow DCF to obtain more specific information. Most importantly, she has not been a parent or even possible parent for Paolo. She visited sporadically from January to September, 1997 and last saw him on September 29, 1997. From that point until February, 1998, she expressed no interest in him. From February on, she has shown occasional interest but it has been through the mails only. Deyna chose to move to Colorado and has chosen so far not to move back. She has not returned for visits or even for either of the termination trials. This evidence gives the court no basis to say that Deyna has assumed or can assume a responsible position in Paolos life. DCF has proven failure to rehabilitate for more than one year against the mother by clear and convincing evidence
The case against the father is not clear and convincing. From Paolos birth to February, 1998, the fathers record is poor, as he readily admitted at trial. Starting in February, the father chose to get the help that he desperately needed. He has now completed an extensive substance abuse program and continues with aftercare. While there is always the risk of relapse, the fathers testimony convinced the court that he is committed to lasting recovery. As demonstrated by his open expression of gratitude to the foster parents, Stephen has matured.
Recently Stephen has resumed visiting Paolo. The visits have gone well, although, to be sure, the credit for Paolos outgoing and playful disposition goes to the foster parents. While Stephen clearly has considerable financial means, and indeed is not even working, the fact that he has recently flown in from Texas every week for a one hour visit with Paolo does demonstrate his renewed devotion to his son. His testimony that he loves Paolo was sincere. On this record, the court simply cannot say that DCF has proven by clear and convincing evidence that the father has not rehabilitated to the point where, within a reasonable time, he could take a responsible position in Paolos life.
3. No Ongoing Relationship
CT Page 2746
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
In the present case, Paolo had no ongoing parent-child relationship with Deyna and Stephen during the adjudicatory period. Although DCF placed Paolo in foster care from birth, this case is not one in which the parents had no chance to develop a relationship with him. Cf. In re Valerie D., 223 Conn. 492, 532
(1992) (DCF custody and termination proceedings begun virtually upon birth of child make it practically impossible to develop parent-child relationship). The parents had ample visiting hours at the outset with the opportunity to establish a justification for more. The parents simply squandered the opportunity. By the end of the adjudicatory period, they were strangers in Paolos life. As a result, Paolo does not mention them now. Despite the recent visits, Paolo does not recognize Stephen as his father.
Instead, Randi and Sergio R. have provided Paolo the only family he has ever known. He has bonded with them and regards them as Mom and Dad. As discussed below, to allow further time for Deyna or Stephen to establish a parent-child relationship would be detrimental to Paolos best interest. Accordingly, the court finds by clear and convincing evidence that there has been no ongoing parent-child relationship with either natural parent for over a year during the adjudicatory period.[7]
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing CT Page 2747 evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Paolo S. clearly and convincingly requires termination of the parental rights of Deyna E. and Stephen S. Paolo is lucky to have been taken out of the drug culture of his natural parents and placed in the home of Sergio and Randi. They have given him exceptional care and devotion. Paolo has prospered as a result. Paolo has now spent virtually his entire life with Sergio and Randi. Paolo understandably regards Sergio and Randi as his parents. They would like to adopt. To prohibit this natural development would be to terminate the wrong parental relationship.
Paolo will undoubtedly benefit from the permanency that termination provides. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). The court recognizes, however, that it has found that Stephen could become a "responsible person" in Paolos life. While a "responsible person" is not necessarily a parent, it could include a visitor. Given that the court has decided to grant the termination petition, it cannot order visitation. Indeed, the effect of this courts decision is to terminate the existing court order allowing visitation. The court nonetheless encourages the foster parents to allow visitation, particularly with Stephen and especially as Paolo grows older and can understand that he has a different biological father. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]s growth and development." Michaud v. Wawruck, 209 Conn. 407, 415
(1988). The court has confidence that the foster parents will take the same enlightened approach to this issue as they have to being foster parents generally.
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. CT Page 2748
Based on the foregoing discussion, the court finds that DCF provided foster care for Paolo and offered the natural parents regular and lengthy visitation. DCF also made referrals to substance abuse treatment centers. These services were relevant to the parents needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On April 4, 1997, the court entered the following expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in drug and alcohol evaluation and counseling and follow recommendations, 5) sign releases as requested, 6) secure and maintain adequate housing and income, 7) no substance abuse. As detailed above, DCF substantially met its obligation to provide assistance but the parents' compliance with these expectations was poor. The father eventually obtained needed substance abuse treatment.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Paolo is bonded to his foster family. Paolos mother is a complete stranger to him and he does not regard Stephen S. as his father.
5) The age of the child.
Paolo is two years old. CT Page 2749
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in Paolos best interest to return to their home. The parents' contact with Paolo decreased steadily until September, 1997, when it ended altogether until the end of 1998. At that point, both parents sent Paolo some gifts, and the father resumed visiting.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own addiction to drugs and not from unreasonable interference by each other or any third person. This case is an unusual one in which the parties had the financial means to raise a child adequately, but unfortunately wasted the money on drugs.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Paolo S. for a termination of parental rights to enter with respect to the mother, Deyna E., and the father, Stephen S. Accordingly, the court hereby grants the termination petition. The court further orders that the Commissioner of DCF is appointed statutory parent for Paolo for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered. CT Page 2750
Carl J. Schuman Judge, Superior Court